**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| XR10 CAPITAL, LLC,<br><br>                                  Plaintiff<br><br>         v.<br><br>NICKOLAS L. REINHART,<br><br>                                  Defendant | C.A. NO. 1:24-cv-00401-RGA<br><br>PUBLIC VERSION |

## COMPLAINT

Plaintiff XR10 Capital, LLC ("Plaintiff") alleges the following against Defendant Nickolas L. Reinhart ("Defendant" or "Reinhart"):

## NATURE OF THE ACTION

1.      Plaintiff brings this action to remedy Reinhart's serial breaches of reasonable and enforceable restrictive covenants contained in a February 15, 2022 Unit Purchase Agreement (the "Purchase Agreement"),[1] by which Reinhart sold his partial ownership interest in Jansan Acquisition, LLC ("Jansan") to Plaintiff (the "Sale Transaction").  In the Sale Transaction, Reinhart personally received a substantial cash payment of approximately ███████ (the minority position sold in the Sale Transaction was obtained by Reinhart along with a ████████ cash payment in a prior, 2018 sale transaction by which he sold his 100% membership interest in Creative Plastic Concepts, LLC ("CPC") to Jansan.  A critical component of the consideration obtained in the Sale Transaction by Plaintiff, whose business (through affiliated entities, particularly its subsidiaries Jansan, American Plastics, LLC ("AP") a parent operating company with no revenues, AP's subsidiary CPC, and the subsidiaries of CPC) involves the design,

---

[1] The Purchase Agreement is adopted and incorporated in this complaint as if fully set forth.

manufacture and sale of high-quality plastic-injection molded home and garage storage solutions, was Reinhart's express agreement not to (i) disclose the confidential information of Jansan or any affiliated company (which includes AP and its subsidiaries) or (ii) solicit the employees or customers of AP and its subsidiaries for a period of two years (the "Restrictive Covenants"). A true and correct copy of the Purchase Agreement, without appendices and exhibits, is attached as **Exhibit A.**

2.       Given Reinhart's extensive involvement in the businesses purchased by Jansan in 2018, the Restrictive Covenants were and are exceedingly important.  Their importance is compounded by the competitive contours of the particular business in which Jansan and its subsidiaries participate, which involves (among many other things) the design and innovation of custom products tailored to the needs of substantial customers – among them, some of the world's largest big box retailers – as well as the design, innovation and creation of the tools and processes by which these products are manufactured.  Consequently, the risks associated with that particularized know-how and the customer relationships it supports being externalized and used against the Jansan affiliated companies in the marketplace is especially acute.

3.       Regrettably, that risk has materialized.  On information and belief, Reinhart has embarked on an ambitious effort to create a diverse plastic design and manufacturing business (directly or through the portfolio companies of a family-owned asset management firm called "Nickolas," which Reinhart founded and controls) to sell, ultimately, to a financial buyer.  Over the course of especially the last three months (solicitations began as early as 2023, but predatory activity has been concentrated in February and March this year), and in direct violation of the Restrictive Covenants, Reinhart has raided the employees – *seventeen* to date, *not* including employees who *declined* Reinhart's overtures – of Jansan subsidiaries AP, CPC (which employed

Reinhart until February 2023, distinguishing Reinhart from the other institutional sellers), and CCP NewCo LLC (AP, CPC, CCP NewCO, and other affiliated entities are sometimes referred to below as the "AP Group," the members of which all are Jansan subsidiaries).

4.      These employee departures (which include a Chief Business Officer, Product Development Manager, Customer Service Manager, Process Manager, Lead Process Technician, Director of Tooling, Plant Manager, Product Development Manager, Senior Sales Coordinator, Project Manager, and Production Manager, among others) impact not only the operations of these companies and their ability to service important customers, but also represents an exodus of confidential business information and know-how.  Worse, upon information and belief, that confidential business information and know-how now resides in companies ultimately owned and controlled by Reinhart that are competing directly with Plaintiff's AP Group – all in violation of the Restrictive Covenants.  Efforts to engage Reinhart on this pattern of predation have been unfruitful, and consequently Plaintiff has no reasonable basis upon which to conclude that it will end.

5.      Additionally, Plaintiff has learned that Reinhart has solicited business from its subsidiaries' two largest customers – ████████████████ – and, as of March 2024, apparently has been successful in luring away the business of the latter.  An unmistakable pattern presents itself:  the employees raided by Reinhart possess precisely the skills, expertise and trade secrets necessary to service the particularized needs of a significant customer like ██████ ████.  Additionally, the timing of Reinhart's employee predation lends itself too readily to the conclusion that the employees targeted and hired by Reinhart were brought in as part of a coordinated effort specifically intended to lure business from and thereafter service ████████ ████, and potentially other significant customers serviced by the AP Group companies.  These

facts and attendant circumstances more than faintly support the conclusion that efforts to capture business from ████████████ and other customers, in violation of the Restrictive Covenants, are ongoing and will continue into the future.

6.      The harm to Plaintiff and its subsidiaries, while not readily susceptible to quantification, has been palpable and likely will be compounded immeasurably if the actions of Reinhart continue unabated.  As described in greater detail below, and by way of illustration only:

(a)      The AP Group's loss of one of their two largest customers and the loss of key personnel has created and likely will in the future continue to create uncertainty among other AP Group customers and vendors regarding the soundness of the AP Group.  Uncertainty among customers and vendors, in turn, threatens potential serious adverse consequences with respect to the AP Group's product pricing and their ability to negotiate favorable terms with vendors.

(b)      The AP Group's loss of one of their two largest customers and the loss of key personnel likewise has had and likely will continue to have an unsettling effect on its employees and business operations.  The employee deficit has impaired their ability to respond to customer initiatives, including by way of specific illustration ████████████████████ ████████████████████.

(c)      Due to the loss of key, management-level personnel, the AP Group companies are experiencing shortfalls in critical operative areas, ████████████████████ ██████. To bolster ████████████████, they must retain the ████████████████ of an outside firm to service their largest customer.  Setting aside the costs, inconvenience and lost time occasioned by this remedial measure, the retention of outside consultants and service providers is not a suitable proxy for employees who, through an historic employment relationship with the AP

Group companies, are familiar with AP Group processes, personnel, culture and other internal business practices and preferences, as well as the business and preferences of AP Group customers.

7.     For these reasons and those alleged in greater detail below, Plaintiff seeks injunctive relief to prevent Reinhart and his affiliates from violating the Restrictive Covenants. Plaintiff further seeks damages, to the extent ascertainable, in an amount to be proven at trial.

## PARTIES, JURISDICTION AND VENUE

8.     Plaintiff XR10 Capital, LLC is a Delaware limited liability company headquartered in Beverly Hills, California.  XR10 Capital, LLC formerly was known as the entity identified in the Purchase Agreement as the "Buyer."

9.     XR10 Capital, LLC has one member, the Green Living Trust, which is organized under the laws of California and has two trustees who are residents of California.

10.     Non-party Jansan, a Delaware limited liability company based in Ohio, is a subsidiary of Plaintiff.  Jansan is a holding company and the parent of AP.

11.     Non-party AP is a Delaware limited liability company and a wholly owned subsidiary of Jansan.  AP is an operating company with no revenue, and is the parent to, among others, CCP NewCo LLC, CPC, and CPC's three subsidiaries: Shelves West, LLC, Centrex, LLC and Two-Six Industries, LLC (again, for ease of reference, AP and its subsidiaries are sometimes referred to as the "AP Group" or the "AP Group companies").  AP and its subsidiaries are engaged in the business of manufacturing and selling high-quality plastic-injection molded home and garage storage solutions.  Their customers include some of the world's largest big box retailers.

12.     Defendant Reinhart is believed to maintain dual residences in Ohio and Florida. Reinhart owned, controlled, and was employed by CPC prior to selling it to Jansan in 2018 (after which time he continued employment by CPC until February 2023).  Upon information and belief, Reinhart founded and controls a family owned and operated asset management firm called,

"Nickolas," whose portfolio companies include Findlay Machine & Tool, Inc. ("FMT," a plastic injection molding business), as well as companies known as "Kreate Engineering" and/or "Kreate Industries" (together or singly, "Kreate").  *See, generally*, https://nickolas.com/ (last visited on March 26, 2024).  On information and belief, Reinhart controls both FMT and Kreate (together the "Reinhart Companies").  The Reinhart Companies, and potentially other affiliated interests, compete with the AP Group companies in the plastics industry.

13.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332. The amount in controversy for each claim exceeds $75,000 exclusive of interest and costs, and as alleged above, neither Plaintiff (organized in Delaware, headquartered in California) nor either of its members (both California) is a citizen of Ohio or Florida; thus, complete diversity of citizenship exists.

14.     This Court has personal jurisdiction over Defendant pursuant to Section 11.8 of the Purchase Agreement, through which Defendant agreed that the federal courts of Delaware have exclusive jurisdiction over any and all actions (excepting challenges to the final purchase price determinations, which are not implicated here) arising under the Purchase Agreement.

15.     While Section 11.7 of the Purchase Agreement contains a choice of law provision designating the law of Delaware, recent Delaware decisional law instructs that the contractual choice of law provision is inapplicable to the Restrictive Covenants and related disputes where repugnant to the policies of another state whose law would apply in the absence of the contractual choice of law.  Accordingly, the claims asserted in this complaint are asserted under and governed by the law of the State of Ohio, because Reinhart (a) was an Ohio resident prior to and at the time of Sale Transaction (and on information and belief presently maintains a residence there), (b) previously was employed by CPC in Ohio, (c) solicited employees from AP Group companies in

-6-

Ohio, (d) hired those employees to work for one of the Reinhart Companies in Ohio, and (e) is wrongfully disclosing confidential information and trade secrets of the AP Group companies to manufacture competing products for ███████ at a plant in Findlay, Ohio.

## FACTUAL BACKGROUND

16.     This case arises out of Reinhart's improper solicitation and employment of employees of AP Group companies (seventeen employees to date, not including individuals solicited but who declined Reinhart's overtures), including employees holding key management positions.   Additionally, this case involves Reinhart's improper solicitation of AP Group's customers, including its two largest customers – ████████████████. Through the stolen employees and otherwise, Reinhart possesses and presumptively is disclosing throughout the Reinhart Companies confidential proprietary information and know-how of Plaintiff and its subsidiaries to compete directly against the AP Group companies.

17.     Reinhart came to own Jansan membership units through a prior sale transaction that took place in 2018.   In that sale, Jansan purchased all of the issued and outstanding membership interests in CPC from Reinhart, CPC's 100% owner.   The consideration paid to Reinhart in the prior sale transaction included approximately ███████ in cash and a minority equity interest in Jansan.  This minority equity interest was sold by Reinhart in the 2022 Sale Transaction at issue in this action.

### A.  The 2022 Sale Transaction.

18.     The Purchase Agreement was executed on May 15, 2022.  Under its terms, Reinhart (along with other institutional sellers) sold his interest in Jansan to Plaintiff XR10 Capital, LLC (then operating under its former name) for approximately ███████ in cash.  Accordingly, Reinhart personally is just under ███████ to-the-better as a result of his participation in these two transactions.

19.     After the 2018 sale transaction, Reinhart continued employment with CPC, which became a subsidiary of AP, until his resignation in February 2023.

20.     The AP Group companies' customers, then and now, include big box multinational home improvement retail companies such as ███████████████, to which they sell and supply high-quality plastic-injection molded home and garage storage solutions.  The companies in the AP Group are operationally highly integrated.  That is, while corporate distinctions are observed, ████████████████████████████████████████████ ███████████████████████████████████████████████. This was true of Reinhart's employment with CPC between 2018 and 2023, during which time he had extensive interactions with personnel and executives associated with numerous of the AP Group companies.

21.     In consideration of the price paid to Reinhart, and as an inducement to the purchasers in both transactions, Reinhart agreed to certain other restrictive covenants in the agreement that governed the 2018 transaction and the 2022 Purchase Agreement including, among other things, required that he and his affiliates (i) refrain from disclosing the confidential information of Jansan or any affiliated company (which includes AP and its subsidiaries) and (ii) refrain from soliciting the employees or customers of AP and its subsidiaries for a period of two years.

**B.  Plaintiff's Trade Secrets, Business and Technical Know-How, and Confidential Information.**

22.     Article I of the Purchase Agreement defines "**Intellectual Property Rights**," in pertinent part, as "████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████ ."   The "██████████████████████████████

-8-

██████████████████████████████████████████████

███████" purchased from Reinhart in the 2018 transaction were integrated into and became an indispensable element of the business of AP and its subsidiaries.

23.    The market for plastic-injection molded home and garage storage solutions is uniquely competitive.  The AP Group companies manufacture custom molded products and market them to a limited number of large box retailers.  Their design and manufacturing processes requires specially formulated tooling and molds, which is not shared with competitors.

24.    The confidential information and trade secrets implicated by this action include, by way of illustration only:  (i) customer pricing information; (ii) employee pay and benefits; (iii) unique manufacturing processes; (iv) vendor and shipping costs; (v) finance and product costs; (vi) capacity studies; (vii) which of six different plants manufactures which products; (viii) the types of tools developed, customized and used in manufacturing processes; (ix) the capital and time required for the manufacture of specific products; (x) the cycle times for machines and associated labor costs; and (xi) new business opportunities.

25.    This confidential information is not generally known outside of the AP Group companies' business, is not even known to all of their employees, is protected by confidentiality agreements signed by certain key employees, and is otherwise safeguarded from public disclosure. The confidential information has value to the AP Group companies in the competitive plastics industry, was developed and protected at great effort and expense, and a competitor would expend time and financial resources to acquire and duplicate this information.

**C.  The Restrictive Covenants.**

26.    **Section 7.5(a)** of the Pursuant to the Purchase Agreement restricts the disclosure of confidential information ██████████████████:



27.     With respect to non-solicitation of employees and customers, **Section 5.10(a)**

provides:



28.     Article I defines the term "**Business Relation**" used in Section 5.10 as "████████

████████████████████████████████████████████████████████████

████████████████████."  The 2022 Sale Transaction closed on May 13, 2022.

29.     With respect to enforceability, **Section 5.10(b)** provides:



### D.  Other Pertinent Terms

30.     With respect to remedies, **Section 11.16** ("Specific Performance") provides that in the event of a breach of any of the terms of the Purchase Agreement, "███████████████████████████████████████████████████████████████████," and therefore, each party "████████████████████████████████████████████████████████████████████████████████████████████████"

31.     In **Section 11.16**, the parties agreed to waive "████████████████████████████████████████████████████████████████████████████████████."

**E.  Reinhart's Breaches**

32.     The plastics industry is highly competitive.  The segment in which AP and its subsidiaries operate is particularly competitive, because it involves (among many other things) the design and innovation of custom products tailored to the needs of substantial customers – among them, some of the world's largest big box retailers – as well as the design, innovation and creation of the tools and processes by which these products are manufactured.  The risks associated with this particularized competitive know-how and customer relationships it supports being externalized and used against AP and its subsidiaries (and thus Jansan) in the marketplace are extremely acute.

33.     As someone with a history in the industry, and in particular as the individual who built, owned and ran the business purchased by Jansan in 2018, and who then maintained that association post-sale as a part-owner and employee, Reinhart ████████████████████████ ████████████ was aware that the Restrictive Covenants to which he had agreed limited his conduct after the Closing Date.  He likewise was well aware of XR10 Capital's significant interest in enforcing the Restrictive Covenants.

34.     Through his association prior to and after 2018 with the business and its customers, Reinhart had prolonged, regular access to Confidential Information and Intellectual Property.  This included information about operations, accounting, customer pricing information, marketing techniques, advertising techniques, finance and product cost, business plans, pricing, sales, customer lists, needs and demands of customers, vendor and shipping costs, the manufacturing processes used by and unique to the business, capacity studies, which of six plants manufacture which products, the types of tools developed, customized, and used in the manufacturing

processes, the capital and time required for manufacturing specific products, the cycle times for machines and associated labor costs, and new business opportunities.

35.     XR10 Capital has a substantial protectible interest in ensuring that Confidential Information, Intellectual Property Rights, and trade secrets are not unlawfully disclosed; consequently, the Restrictive Covenants in Sections 5.10 and 7.5 of the Purchase Agreement were and are warranted, reasonable, proportionate, and advance a material objective of the Sale Transaction.  Without them, Reinhart's departure from Jansan would imperil the value of the business assets obtained by Jansan from Reinhart (at great cost) in 2018 and developed at considerable expense since.

**F.  Reinhart's improper solicitation of customers.**

36.     Both pre and post-Sale Transaction, Reinhart was aware of and in fact interacted extensively with important customers, among them, ███████████████ . ███████████ ███████████ are the AP Group's two largest customers.

37.     On March 1, 2024, Albert Church, Executive Vice President of Sales for AP (who worked with Reinhart while Reinhart was employed by CPC), received a phone call from Reinhart, during which Reinhart advised: (i) that he was calling to apologize for hiring Clay Dysert, a Senior Sales Coordinator at CPC; (ii) that he was apologizing because he had a recent call with Mr. Guerra in which he promised Mr. Guerra that he would not solicit employees of AP and its subsidiaries; and (iii) that, in his view, the AP Group had to choose between ███████████████ (notwithstanding the fact that the AP Group companies had served both of these companies as customers contemporaneously for years).  As it turns out, Reinhart's statements were not empty rhetoric: On approximately March 18, 2024, Mr. Church was advised by a █████ representative while at a lunch meeting in Chicago, Il. that, approximately five months previously, Reinhart



solicited <span style="background:black">████</span> and quoted them a price for the business residing with the AP Group.  On March 22, 2024, the <span style="background:black">████</span> representative advised Mr. Church in the course of routine business interactions that Reinhart "recently" had contacted the <span style="background:black">████</span> representative in a follow-up effort, once again, to get <span style="background:black">████</span> to steer AP Group business to one of the Reinhart Companies. On information and belief, notwithstanding Reinhart's serial solicitations, <span style="background:black">████</span> has elected to maintain its customer relationship with the AP Group and declined Reinhart's overtures.

38.     Plaintiff also has learned that Reinhart spoke and/or met directly with a representative from <span style="background:black">████</span> at least once in June or July 2023.  This contact was not undertaken on behalf of AP or any of its subsidiaries (as recently as last year, <span style="background:black">████████</span> <span style="background:black">████████████████████</span>); rather, it involved an effort to steer home storage products business away from AP Group companies to one of the Reinhart Companies.

39.     Regrettably, Reinhart's solicitation of <span style="background:black">████████</span> appears to have been successful.  In March 2024, it became clear that <span style="background:black">████████</span> was moving its business historically and consistently has conducted with CPC and its subsidiaries to, presumably, the Reinhart Companies.

**G.  Reinhart's improper solicitation of key employees, apparently to facilitate customer predation**

40.     To meet the substantial needs of a major customer like <span style="background:black">████████</span>, Reinhart required the particularized expertise of capable and well-trained employees.  At least as early as February 2023, and despite the Restrictive Covenants, Reinhart or individuals acting under his control and on his behalf began soliciting employees of the AP Group companies to work for the Reinhart Companies.

41.     The employment opportunities offered to AP Group employees by Reinhart fell chiefly into two categories: (i) to discontinue employment with AP Group companies and switch to one of the Reinhart Companies or (ii) to continue working for AP Group companies while contemporaneously working for the Reinhart Companies.

42.     A recently-discovered e-mail residing on company servers illustrates an example of the latter.  On September 25, 2023, a key supplier of molds used in the manufacturing process by AP and its subsidiaries sent an e-mail to Eric Hummel and Ben Sayalith about certain confidential product specifications and designs for a ▮▮▮▮▮▮▮ product.  Notably, the vendor sent the e-mail to "eric@kreate.com" (Hummel) and "ben@kreate.com" (Sayalith).  Although Sayalith departed CPC roughly six months earlier to work for Reinhart, Hummel was then an employee of CPC and not known to be working for Kreate or any of the other Reinhart Companies.  The e-mail, however, in which Hummel uses a "kreate.com" e-mail address and a "Kreate Extrusion, LLC" signature block, demonstrates vividly that Hummel was (i) working with a key AP Group vendor, (ii) while employed by CPC, (iii) *but on behalf of Reinhart, not CPC*.

43.     AP's Chief Executive Officer and President, Robert Guerra, spoke to Reinhart in July 2023 (by which time, on information and belief, Reinhart's improper solicitation efforts had intensified).  During that conversation, Reinhart informed Guerra that he had spoken and/or met with representatives of ▮▮▮▮▮▮▮ and was considering engaging in business with ▮▮▮▮▮▮▮ ▮▮▮ for home storage products.  In response, Guerra reminded Reinhart that he was subject to contractual non-compete and non-solicitation restrictions which prevented him from pursuing the business relationship he sought with ▮▮▮▮▮▮▮.

44.     Guerra again spoke to Reinhart in approximately mid-February 2024.  As before, Guerra reminded Reinhart of his agreement not to compete with AP's business or solicit customers

and employees.  Reinhart assured Guerra that he would do no such thing – but soon after hired a senior salesperson from CPC.

45.     Despite Guerra's discussions with Reinhart and in violation of the Restrictive Covenants, seventeen employees from the AP Group companies were solicited and hired by Reinhart or individuals acting on his behalf to work for one or more of the Reinhart Companies. Several of these employees explicitly advised upon departure that they were going to work for FMT or another Reinhart Company.  The stolen employees include:

|     | **Name** | **Location** | **Title** | **American Plastics Entity** | **Departure** |
|-----|----------|--------------|-----------|------------------------------|---------------|
| 1.  | Ben Sayalith | Innovation Center-OH | Product Development Manager | Creative Plastic Concepts, LLC | 3/30/2023 |
| 2.  | Deidra Reinhart | Sycamore, OH | Press Operator | Creative Plastic Concepts, LLC | 12/2/2023 |
| 3.  | Sara Sendelbach | Hercules Warehouse, OH | Customer Service Manager | Creative Plastic Concepts, LLC | 12/3/2023 |
| 4.  | Wendy Strobel | Tiffin Warehouse, OH | Shipping Administrator | CCP Newco, LLC as of 4.26.2022, Creative Plastics Concepts, LLC prior | 12/8/2023 |
| 5.  | Paul Knowlton | Tiffin, OH | Process Manager | CCP Newco, LLC | 12/21/2023 |
| 6.  | Donnie Raye | Findlay, OH | Lead Process Tech | Creative Plastic Concepts, LLC | 12/29/2023 |
| 7.  | Eric Hummel | Innovation Center-OH | Director of Tooling | Creative Plastic Concepts, LLC | 12/29/2023 |
| 8.  | Travis Ritter | Findlay, OH | Plant Manager | Creative Plastic Concepts, LLC | 12/29/2023 |
| 9.  | Tony Vilay | Innovation Center-OH | Product Development Manager | Creative Plastic Concepts, LLC | 2/23/2024 |
| 10. | Bill Gruenemeyer | Innovation Center-OH | Engineering Financial Analyst | Creative Plastic Concepts, LLC | 2/23/2024 |
| 11. | Clay Dysert | Innovation Center-OH | Sr. Sales Coordinator | Creative Plastic Concepts, LLC | 3/1/2024 |
| 12. | Brian Nichols | Corporate | Chief Business Officer | American Plastics, LLC as of 1.1.2024, CCP Newco, LLC prior | 3/1/2024 |
| 13. | Eric McMillian | Sycamore, OH | Maintenance Manager | Creative Plastic Concepts, LLC | 3/15/2024 |
| 14. | Bill Flemming | Findlay, OH | Project Manager | Creative Plastic Concepts, LLC | 3/15/2024 |
| 15. | Christopher Boone | Sycamore, OH | Production Manager | Creative Plastic Concepts, LLC | 3/15/2024 |
| 16. | Larry Tucker | Sycamore, OH | Plant Manager | Creative Plastic Concepts, LLC | 3/15/2024 |
| 17. | Marianne Thomas | Findlay, OH | Customer Service | Creative Plastic Concepts, LLC | 3/23/2024 |

46.     The employee predation was and is material.  Like Reinhart himself, certain of the employees hired away by Reinhart held senior positions and possess knowledge and information about the confidential business operations, know-how and trade secrets of AP and its subsidiaries.

47.     Based in part on the dates they left (all but one of the seventeen stolen employees were hired by Reinhart between December 2023 and March 2024 – additionally, groups of key employees left on the same day, with three employee departures on December 29, 2023, two on February 23, 2024, two on March 1, 2024, and four on March 15, 2024), Plaintiff reasonably believes and therefore alleges that the employees solicited and hired by Reinhart were targeted to facilitate the transfer of ██████████ business to one of the Reinhart Companies.

48.     After the departure of CPC Product Development Manager Ben Sayalith in March 2023, one of the first key employees hired by Reinhart was Sara Sendelbach, a Customer Service Manager.  Ms. Sendelbach administered ███████████ account for CPC.  She left CPC on December 3, 2023 to join FMT or one of the other Reinhart Companies.

49.     Reinhart also hired Paul Knowlton, a Process Manager, and Donnie Raye, a Lead Process Tech.  These key employees are critical to running the equipment needed to meet the needs of a major customer such as ██████████.  Mr. Knowlton left AP subsidiary CCP NewCo LLC on December 21 and Mr. Raye left CPC on December 29, 2023 to join FMT or one of the other Reinhart Companies.

50.     Reinhart hired Eric Hummel, CPC's Director of Tooling.  Mr. Hummel administered the purchase and design of the tools needed to mold AP Group's products, including for ██████████.  Mr. Hummel left CPC on December 29, 2023 to join FMT or one of the Reinhart Companies.

51.     Reinhart hired Travis Ritter, one of CPC's Plant Managers.  Mr. Ritter ran one of the six plants used by AP and its subsidiaries.  Like Mr. Raye and Mr. Hummel, Mr. Ritter left CPC on December 29, 2023 to join FMT or one of the Reinhart Companies.

52.     One of the employees very recently solicited and hired by Reinhart is Brian Nichols.  Brian Nichols was the Chief Business Officer of AP, a senior position.

53.     On January 12, 2021, Brian Nichols and AP entered into an Amended and Re-stated Employment Agreement (the "Nichols Agreement") under which Nichols agreed, among other things, to certain restrictive covenants, including an agreement not to compete with AP and its affiliates.

54.     When the Nichols Agreement was executed and for several months after, Reinhart still owned an equity interest in Jansan and was working for CPC.  Consequently, Reinhart knew Nichols, worked with him and was aware of the Nichols Agreement.

55.     In response to Reinhart's solicitation, Nichols left AP on March 1, 2023 and now works for one of the Reinhart Companies.  By soliciting and hiring Nichols to work for a competitor of AP and its subsidiaries, Reinhart tortiously interfered with the Nichols Agreement, to the immediate and incalculable detriment of AP and its subsidiaries, and consequently, XR10 Capital.

56.     Other solicitations were material, but unsuccessful.  In August or September 2023, Guerra himself was contacted by Reinhart.  Reinhart explained to Guerra during that phone conversation that he was considering the acquisitions of two other injection molding businesses to add them to his existing portfolio of companies.  Also during that call, Reinhart advised that his intention was to build out a diverse portfolio of companies in the plastic industry and sell them to a financial buyer.

57.     Reinhart advised Guerra that if there were one person he would like to bring over to lead his portfolio of companies, it was Guerra.  Reinhart then described the salary and deferred compensation plan he was offering for the position that Guerra would assume.  Guerra declined to pursue the opportunity.  Upon information and belief, a position similar to the one offered to Guerra later was offered to and accepted by AP Chief Business Officer Brian Nichols.

58.     In approximately January 2024, Reinhart solicited CPC's Vice-President of Sales, Rochelle Pilz, to work for FMT or one of the other Reinhart Companies.  Ms. Pilz likewise declined Reinhart's offer.

59.     The specific expertise of the employees targeted by Reinhart likewise strongly evidences a pattern of predation calculated to facilitate the solicitation of ██████████ and possibly other AP Group customers.  This is so because their particular expertise and capabilities are those necessary to build out the employee base and product portfolio required to serve ██ ████████ particularized and very substantial product needs.  Upon information and belief, ████████ continues to be a Reinhart Company customer, with Reinhart performing exactly the same product services for ████████ now as he did while an owner of Jansan and an employee of CPC.

**H. Impairment of Customer, Vendor, and Employee Good Will**

60.     Reinhart's predations have had a palpable impact on the customer, vendor and employee good will of AP and its subsidiaries, and likely will further impact the business of the AP Group in the future.

61.     The loss of one of the two largest customers and key personnel has created and likely will in the future create uncertainty among other AP Group customers and vendors regarding the soundness and stability of the AP Group and its business.  Uncertainty among customers and

vendors, in turn, potentially disadvantages the AP Group with respect to the prices it can charge customers and the terms it can negotiate with vendors necessary to support its business.

62.     The loss of one of its two largest customers and key personnel likewise has had and likely will continue to have an unsettling effect on the employees and its business operations of AP Group companies.  The departures of key employees alleged above puts AP and its subsidiaries at a disadvantage in terms of their ability to respond to customer initiatives – including, by way of specific illustration, ███████████████████████████████████████████.

63.     Due to the loss of key personnel, the AP Group is experiencing deficits in key operative areas, with one substantial customer expressing concerns over the AP Group's present ████████████████████.

64.     To mitigate the effects of Defendant's predation and bolster is ███████ ████████, AP has been forced to retain the ███████████████ of an outside firm to service the AP Group's largest customer.  Setting aside the attendant costs, inconvenience and lost time (which are potentially substantial but difficult if not impossible to quantify with precision), the retention of outside consultants and service providers is not a suitable proxy for employees who, through an historic employment relationship with AP or its subsidiaries, are familiar with AP Group processes, personnel, culture and other internal business practices and preferences, as well as the business and preferences of AP Group customers.

### I.   Exodus and Presumptive Disclosure of AP's Company Confidential Information

65.     Like Reinhart himself, certain of the AP Group employees who Reinhart targeted and hired held senior positions and possess knowledge and information about the confidential business operations, know-how and trade secrets of AP and its subsidiaries.  This includes, but is not limited to:

(a)     Customer pricing information;

(b)     Employee pay and benefits;

(c)     The manufacturing processes used by and unique to AP;

(d)     Vendor and shipping costs;

(e)     Finance and product cost;

(f)     Capacity studies;

(g)     Which of AP's six plants manufacture which products;

(h)     The types of tools developed, customized and used by AP in its

manufacturing processes;

(i)     The capital and time required for manufacturing specific products;

(j)     The cycle times for AP's machines and associated labor costs; and

(k)     New business opportunities.

66.     This confidential information (i) is not generally known outside of the AP Group's business, (ii) is not even known to all AP Group employees, (iii) is protected by confidentiality agreements with key AP Group employees and is otherwise safeguarded from public disclosure, (iv) has value to the AP Group in the competitive plastics industry, (v) was developed and protected at great effort and expense; and (vi) would require time and expense for a competitor to acquire and duplicate.  Nonetheless, it now essentially has been institutionalized (*i.e.*, "disclosed") within and throughout the Reinhart Company organizational structure, and possibly beyond.  It also unquestionably is being used solicit business from AP Group customers in further violation of the Restrictive Covenants.

**J.   Imminent Threat of Irreparable Future Harm**

67.     The loss of its employees and the misappropriation of its confidential business information and trade secrets has hampered the AP Group's production capacity and, as alleged above, irreparably damaged the good will of its customers, vendors and employees.

68.     In the absence of an injunction enforcing the Restrictive Covenants to which Reinhart agreed, and for which he was paid ██████████ ██████████ the AP Group's business reputation and the good will of its customers, vendors and employees will be irreparably damaged further.

69.     Upon information and belief, Reinhart's improper solicitation of employees and customers is ongoing, and likely will continue into the future in furtherance of his stated objective to build out a diverse plastics business portfolio and posture it for a private equity sale.

70.     Reinhart has breached Sections 5.10 and 7.5 of the Purchase Agreement without legal justification or excuse, and will cause Plaintiff future irreparable harm.

71.     While generally reluctant to commence expensive litigation, Plaintiff initiated this action to seek injunctive and other relief to prevent Reinhart from continuing his unlawful behavior in light of (a) the very recent loss in mid-March 2024 of substantially all of the orders historically and consistently made by ██████████, (b) becoming aware from conversations with a ██████ representative on March 18, 2024 and again on March 22, 2024 that Reinhart was soliciting business from ██████, (c) the loss of seven additional employees from March 1 to 23, 2024, including the departure of AP's second senior-most executive, Brian Nichols, and (d) the discovery in mid-March 2024 of emails showing coordination and sharing of trade secrets between now departed employees and a key mold vendor of AP.

## COUNT I

**(Breach of Contract:  Purchase Agreement – Non-Solicitation of Employees)**

72.     The allegations in the preceding paragraphs are incorporated by reference as if fully restated.

73.     The Purchase Agreement is a valid, binding, and enforceable contract.

74.     Plaintiff has complied in all material respects with its obligations under the Purchase Agreement, including paying ▇▇▇▇▇▇ of dollars to Reinhart in exchange for his agreement to the Restrictive Covenants.

75.     As alleged above, Reinhart agreed to multiple non-solicitation restrictions under the Purchase Agreement.

76.     Reinhart has breached the Purchase Agreement by soliciting and/or hiring no less than seventeen AP Group employees following the Closing Date of the Purchase Agreement – starting in earnest in late 2023, with concentrated predatory activity over the course of the last three months.

77.     Reinhart's breaches of the Purchase Agreement have caused and will continue to cause irreparable injury and damages to Plaintiff.

78.     Reinhart's breaches of the Purchase Agreement have damaged and continue to damage Plaintiff and its affiliates' business and customer relationships, including through the loss of one of its two largest customers and the team that serviced that customer as a direct consequence of Reinhart's strategic and unlawful solicitation.

79.     Certain of the AP Group employees Reinhart plundered held senior positions and possess knowledge and information about the companies' confidential business operations, know-how and trade secrets.

-23-

80.     Reinhart contractually agreed that a violation of the Restrictive Covenants would constitute irreparable harm entitling Plaintiff to injunctive relief.

81.     There is no substitute or replacement for Reinhart's compliance with the Restrictive Covenants because Reinhart is uniquely positioned to harm Plaintiff and its subsidiaries, given his knowledge of Plaintiff's and the AP Group's Confidential Information and Intellectual Property and the knowledge of those he improperly solicited and/or hired to work for enterprises he controls, and which directly compete with Plaintiff and the AP Group.

82.     If Reinhart is not enjoined from continuing to breach the Purchase Agreement by soliciting employees and from additional breaches of the Restrictive Covenants, Plaintiff and the AP Group will continue to suffer harm to its business and personnel relationships.

83.     If the Restrictive Covenants are not enforced, and Reinhart is not enjoined from additional violations of the Purchase Agreement, it is likely that Reinhart will cause Plaintiff and the AP Group irreparable harm in addition to the harm already caused.

84.     Reinhart's breaches of the Purchase Agreement also have caused substantial damages, including costs associated with this litigation, and will cause further substantial damages if Reinhart and his affiliates are not enjoined from violating the Restrictive Covenants.  Plaintiff therefore is entitled to damages in an amount to be determined at trial.

85.     Plaintiff also is entitled to a preliminary injunction enforcing the Restrictive Covenants.

## COUNT II

### (Breach of Contract:  Purchase Agreement – Non-Solicitation of Customers)

86.     The allegations in the preceding paragraphs are incorporated by reference as if fully restated.

-24-

87.     The Purchase Agreement between Plaintiff and Reinhart is a valid, binding, and enforceable contract.

88.     Plaintiff has complied in all material respects with its obligations under the Purchase Agreement, including paying ███████ ██████ to Reinhart in exchange for his agreement to the Restrictive Covenants.

89.     As alleged above, Reinhart agreed to multiple non-solicitation restrictions under the Purchase Agreement

90.     Reinhart has breached the Purchase Agreement by soliciting and engaging in business with the customers of the AP Group, including one of its largest customers, ██████ ████, following the Closing Date of the Purchase Agreement, resulting in the loss of ████████ ██████ business in mid-March 2024 and continuing through the present.

91.     Reinhart has or has attempted to engage in business with key customers, and to solicit and divert key customers away from the AP Group in violation of the Purchase Agreement, including ███████████████.

92.     Reinhart's breaches of the Purchase Agreement have caused and will continue to cause irreparable injury and damages to Plaintiff and the AP Group.

93.     Reinhart's breaches of the Purchase Agreement have damaged and continue to damage the AP Group's business and customer relationships, including through the loss of one of its two largest customers and the team that serviced that customer as a direct consequence of Reinhart's coordinated and unlawful solicitation.

94.     Reinhart contractually agreed that a violation of the Restrictive Covenants would constitute irreparable harm entitling Plaintiff to injunctive relief.

95.     There is no substitute or replacement for Reinhart's compliance with the Restrictive Covenants because Reinhart is uniquely positioned to harm Plaintiff and its subsidiaries unlike any other person, given his knowledge of Plaintiff's and the AP Group's Confidential Information and Intellectual Property and the knowledge of those employees he improperly has plundered.

96.     If Reinhart is not enjoined from continuing to breach the Purchase Agreement by engaging in business with, soliciting and/or diverting customers and from additional breaches of the Restrictive Covenants, Plaintiff and the AP Group will continue to suffer harm to their business and customer relationships.

97.     If the Restrictive Covenants are not enforced, and Reinhart is not enjoined from additional violations of the Purchase Agreement, it is likely that Reinhart will cause irreparable harm in addition to the harm already caused.

98.     Reinhart's breaches of the Purchase Agreement also have caused substantial damages, including costs associated with this litigation, and will cause further substantial damages if Reinhart is not enjoined from violating the Restrictive Covenants.  Plaintiff is entitled to damages in an amount to be determined at trial.

99.     Plaintiff also is entitled to a preliminary injunction enforcing the Restrictive Covenants.

## **COUNT III**

### **(Breach of Covenant of Good Faith and Fair Dealing – Solicitation of Customers)**

100.    The allegations in the preceding paragraphs are incorporated by reference as if fully restated.

101.    The Purchase Agreement between Plaintiff and Reinhart is a legally binding, enforceable contract.

102.     Plaintiff has performed all of its obligations under the Purchase Agreement, including paying ███████  ███████ to Reinhart for his agreement to the Restrictive Covenants.

103.     The Purchase Agreement carries with it an implied covenant of good faith and fair dealing.

104.     Included in this implied covenant is the promise that Reinhart would not interfere with Plaintiff's business by soliciting customers away from the Company and its subsidiaries. Such a covenant is necessary to effectuate the purpose of the Purchase Agreement.

105.     By engaging in the acts described above, Reinhart breached the implied covenant of good faith and fair dealing by, in the absence of good faith, intentionally soliciting AP Group customers to the detriment of Plaintiff and for his own benefit in violation of the Purchase Agreement.

106.     As a result of Reinhart's breaches of the implied covenant of good faith and fair dealing, Plaintiff and its subsidiaries have been deprived of the protections of the Restrictive Covenants that should have protected Plaintiff from unlawful solicitation of customers.

107.     As a direct and proximate result of Reinhart's breaches, Plaintiff has suffered and will continue to suffer damages in an amount to be determined at trial.

## COUNT IV

### (Breach of Covenant of Good Faith and Fair Dealing – Solicitation of Employees)

108.     The allegations in the preceding paragraphs are incorporated by reference as if fully restated.

109.     The Purchase Agreement between Plaintiff and Reinhart is a legally binding, enforceable contract.

110.     Plaintiff has performed all of its obligations under the Purchase Agreement, including paying ███████  ███████ to Reinhart for his agreement to the Restrictive Covenants.

111.     The Purchase Agreement carries with it an implied covenant of good faith and fair dealing.

112.     Included in this implied covenant is the promise that Reinhart would not interfere with Plaintiff's business by soliciting and/or hiring employees.  Such a covenant is necessary to effectuate the purpose of the Purchase Agreement.

113.     By engaging in the acts described above, Reinhart breached the implied covenant of good faith and fair dealing by, in the absence of good faith, intentionally soliciting and/or hiring Plaintiff's and its subsidiaries' employees for his own benefit in violation of the Purchase Agreement.

114.     As a result of Reinhart's breach of the implied covenant of good faith and fair dealing, Plaintiff has been deprived of the protections of the Restrictive Covenants that should have protected it from unlawful solicitation of employees, in turn depriving it of a material element of consideration bargained for and realized in the 2022 Sale Transaction.

115.     As a direct and proximate result of Reinhart's breach, Plaintiff has suffered and will continue to suffer damages in an amount to be determined at trial.

## COUNT V

### (Tortious Interference with Existing and Prospective Economic Advantage)

116.     The allegations in the preceding paragraphs are incorporated by reference as if fully restated.

117.     The Purchase Agreement constitutes a valid and binding legal contract between Plaintiff and Reinhart.

118.     Reinhart has at all times been aware of the terms of the Purchase Agreement.

119.     Reinhart possessed and continues to possess critical inside knowledge regarding the Confidential Information of Plaintiff and its subsidiaries, including customer lists, customer pricing, employee pay and benefits and the Intellectual Property and other trade secrets.  Reinhart improperly used and disclosed the Confidential Information, Intellectual Property, and other trade secrets to benefit himself and to the detriment of Plaintiff and its subsidiaries.

120.     The Confidential Information and Intellectual Property Rights and other trade secrets (when not shared with competitors) gave Plaintiff and its subsidiaries a reasonable probability of continuing existing business relationships and developing new ones.

121.     Reinhart intentionally interfered with and usurped the existing and future business opportunities of Plaintiff and its subsidiaries by using the Confidential Information, Intellectual Property and other trade secrets to compete with Plaintiff and its subsidiaries.

122.     Reinhart's acts caused and will continue to cause Plaintiff actual damages, including lost profits, for which Plaintiff seeks recovery.

## COUNT VI

### (Tortious Interference with the Nichols Agreement)

123.     The allegations in the preceding paragraphs are incorporated by reference as if fully restated.

124.     The Nichols Agreement constituted a valid and binding legal contract between senior executive Brian Nichols and AP.

125.     At the time the Nichols Agreement was executed, and for several months thereafter, Reinhart still was an owner of Jansan and working with Jansan and the AP Group.  Consequently, Reinhart knew and worked with Nichols and was aware of the Nichols Agreement.

126.     Despite this knowledge, Reinhart intentionally and without justification or excuse interfered with the Nichols Agreement by inducing Mr. Nichols to terminate his employment with

AP and assume a position with one of the Reinhart Companies for the purpose of competing against the AP Group.

127.     As a direct and proximate result of Reinhart's conduct, Plaintiff and its subsidiaries have suffered and will continue to suffer injury and damages.

## COUNT VII

### (Misappropriation of Trade Secrets)

128.     The allegations in the preceding paragraphs are incorporated by reference as if fully restated herein.

129.     The Confidential Information qualifies as trade secret.

130.     Plaintiff and its subsidiaries have taken reasonable measures to keep the Confidential Information secret from third parties and from some of their own employees.

131.     Plaintiff and its subsidiaries derive independent economic value from the Confidential Information not being generally known to, and not being readily ascertainable through proper means, by others who can obtain economic value from the disclosure or use of the information.

132.     Reinhart had access to the Confidential Information as a result of his prior ownership of the business purchased by Jansan and as a result of his employment with CPC (and other related business interests swept into CPC in connection with the 2018 and 2022 sale transactions).   Likewise, the employees stolen by Reinhart (many of whom held high-level management positions and interacted with ████████████) had access to the Confidential Information in the course of their employment by the AP Group companies.   On information and belief, the Confidential Information is being used, directly and indirectly, and perhaps unavoidably, by Reinhart and the companies and employees he now controls to improperly engage in a competitive business venture.   Additionally, the Confidential Information essentially has been

-30-

institutionalized (*i.e.*, "disclosed") within and throughout the Reinhart Company organizational structure, and possibly beyond.   It also unquestionably is being used solicit business from AP Group customers in further violation of the Restrictive Covenants.

133.    Reinhart is not authorized to use or disclose Plaintiff's Confidential Information. Moreover, the Restrictive Covenants prohibit him from doing so.

134.    By using and disclosing the Confidential Information, Intellectual Property, and other trade secrets of Plaintiff and its subsidiaries, Reinhart has wrongfully assumed dominion and control over the personal property of Plaintiff and its subsidiaries, to the exclusion of or inconsistent with their rights.  Plaintiff and its subsidiaries own and are entitled to sole possession of the Confidential Information, Intellectual Property, and other trade secrets.

135.    Reinhart's use of the Confidential Information, Intellectual Property, and other trade secrets of Plaintiff and its subsidiaries constitutes misappropriation of trade secrets.

136.    As a direct and proximate result of Reinhart's conduct, Plaintiff and its subsidiaries have suffered and will continue to suffer injury and damages.

## REQUEST FOR RELIEF

WHEREFORE Plaintiffs respectfully request that the Court:

A.    Enter an injunction in favor of Plaintiff, and against Reinhart and any affiliated individual or enterprise:

1.    Enforcing and enjoining Reinhart from violations of Articles 5.10 and 7.5 of the Purchase Agreement;

2.    Enjoining Reinhart and any affiliated individual or enterprise under his direction or control, from encouraging, soliciting or inducing, or contacting with a view to hire, engage or employ, or in any manner attempting to encourage, solicit or induce, any employer or consultant of the AP Group companies to terminate such employment or

services (or in the case of a consultant, materially reduce such services); hiring any employee that is or was, at any time within nine (9) months of such proposed hiring, employed by an the AP Group company or any of its subsidiaries currently or in the last nine (9) months; and

      3.    Enjoining Reinhart and any affiliated individual or enterprise under his direction or control from knowingly encouraging, soliciting or inducing any Business Relation of the AP Group companies to cease business with, reduce the amount of business conducted with, or alter the terms in a manner adverse to Plaintiff or the AP Group companies;

      4.    Enjoining Reinhart and his affiliates from usurping existing and future business opportunities of Plaintiff and its subsidiaries by using the Confidential Information, Intellectual Property and other trade secrets to compete with Plaintiff and its subsidiaries;

B.    Enter a judgment in favor of Plaintiff, and against Reinhart for:

      1.    An award of actual damages;

      2.    Court costs and attorneys' fees; and

      3.    Pre-judgment and post-judgment interest.

C.    Order such other and further relief as this Court deems just and proper.

**[SIGNATURE BLOCK ON FOLLOWING PAGE]**

MONTGOMERY McCRACKEN
WALKER & RHOADS LLP

/s/ R. Montgomery Donaldson
R. Montgomery Donaldson (DE Bar #4367)
Stefania A. Rosca (DE Bar #6494)
1105 North Market Street, 15th Floor
Wilmington, DE 19801
Tel: (302) 504-7800
*rdonaldson@mmwr.com*
*srosca@mmwr.com*

*Attorneys for Plaintiff*

**OF COUNSEL:**

Timothy J. Pastore, Esquire
MONTGOMERY McCRACKEN
  WALKER & RHOADS LLP
437 Madison Avenue, 24th Floor
New York, NY 10022
(212) 551-7707
*tpastore@mmwr.com*

Brett M. Waldron, Esquire
Elizabeth Catalano, Esquire
MONTGOMERY McCRACKEN
  WALKER & RHOADS LLP
1735 Market Street
Philadelphia, PA  19103
(215) 772-1500
*bwaldron@mmwr.com*
*ecatalano@mmwr.com*

Dated: March 28, 2024